IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-01954-MSK-KMT

NICK MOLINA,

    Plaintiff,

v.

FORD MOTOR COMPANY, a Delaware Corporation,

    Defendant.

---

# OPINION AND ORDER ON
# MOTIONS FOR PARTIAL SUMMARY JUDGMENT

**THIS MATTER** comes before the Court pursuant to both the Plaintiff's Motion for Partial Summary Judgment **(# 30)**, Defendant's response **(# 36)**, and the Plaintiff's reply **(# 40)** and the Defendant's Motion for Partial Summary Judgment **(# 28)**, the Plaintiff's response **(#34)**, and the Defendant's reply **(# 39)**.

## JURISDICTION

The Court exercises jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 2310(d)(1)(B) in that Plaintiff brings claims pursuant to the Magnuson-Moss Warranty Act ("MMWA")[1], 15 U.S.C. § 2310 *et seq.,* and the amount in controversy exceeds $50,000.00.

---

[1] "The Magnuson-Moss Warranty Act creates federal standards for warranties provided to buyers of consumer goods. The act also provides specific remedies to purchasers where sellers of consumer goods fail to comply with the federal warranty standards. 15 U.S.C. § 2310. Notwithstanding, causes of action for personal injuries arising out of the sale of allegedly defective products generally remain a matter of state law. 15 U.S.C. § 2311(b)." *Bush v. Am. Motors Sales Corp.*, 575 F. Supp. 1581, 1582 (D.Colo. 1984).

1

The Court also exercises diversity jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1332, and sitting in diversity, applies Colorado law to the parties' dispute.[2] *See Perlmutter v. U.S. Gypsum Co.*, 4 F.3d 864, 869 (10th Cir. 1993).

## FACTS

The Court summarizes the pertinent, undisputed facts here and elaborates as necessary in its analysis.

On March 30, 2017, Plaintiff Nick Molina purchased a new Ford F-150 SuperCrew 4WD Platinum vehicle ("vehicle") through the Overseas Military Sales Corporation, which delivered the vehicle to the Phil Long Ford dealership in Colorado Springs, Colorado. Mr. Molina paid $65,959.00 for the vehicle, and on June 16, 2017, he picked it up at the dealership. **(# 1 ¶ 1)**.

The vehicle was sold with a "New Vehicle Limited Warranty" that provided "bumper-to-bumper" warranty coverage for three years or the first 36,000 miles. **(# 30-2 at 9, 12-13)**. The warranty provides in pertinent part:

> WHAT IS COVERED?
> …
> Under your New Vehicle Limited Warranty if:
> - your Ford vehicle is properly operated and maintained, and
> - was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in the factory-supplied materials or factory workmanship.
>
> This warranty does not mean that each Ford vehicle is defect free. Defects may by unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs. Ford provides the New Vehicle Limited Warranty only to remedy manufacturing defects that result in vehicle part malfunction or failure during the warranty period.

---

[2] The parties agree that the Colorado Uniform Commercial Code ("CUCC") as enacted by the Colorado General Assembly applies to Plaintiff's claims. *See* Colo. Rev. Stat. § 4-2-102.

> The remedy under this written warranty, and any implied warranty, is limited to repair, replacement, or adjustment of defective parts. This exclusive remedy shall not be deemed to have failed its essential purpose as long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner. Ford's liability, if any, shall in no event exceed the cost of correcting manufacturing defects as herein provided and upon expiration of this warranty, any such liability shall terminate.
>
> …
>
> Nothing in this warranty should be construed as requiring defective parts to be replaced with parts of a different type or design than the original part, so long as the vehicle functions properly with the replacement part. Moreover, Ford and its authorized dealers are entitled to a reasonable time and a reasonable number of attempts within which to diagnose and repair any defect covered by this warranty.

**(# 30-2 at 12-13)**.

**First Repair**

Six months after purchase, on January 8, 2018, Mr. Molina's son delivered the vehicle to the Phil Long dealership for repairs covered under the warranty to address defects with the electrical systems: (1) errors in the blind spot and cross traffic detection system; (2) running boards failing to deploy; (3) center console lights flickering; (4) loss of driver accessory controls; (5) loss of radio and heater function; and (6) loss of window controls. **(# 30-3 at 1)**.

The repair records indicate that the technician confirmed some of the reported electrical problems stating that when he "road tested" the vehicle, it "lost heater and radio controls along with driver[']s window controls." **(# 30-3 at 2)**. The technician suspected that the vehicle's computer had not been programmed properly during assembly, so he reprogrammed the computer, reset the "lock configuration" along with other vehicle "system[s]" and "sensors." The technician determined that the "lane departure system was not calibrated," so he "drove the vehicle on the highway to relearn lane departure parameters as well as calibrating the latitudinal acceleration sensor." **(# 30-3 at 2)**. The technician also found a network problem associated

with the window controls and replaced the defective "modules" by removing the "instrument panel/dash and center console as well as both front door panels and rear tail lights." **(# 30-3 at 3)**. The technician then test drove the vehicle and found "no issues present." The repair record indicates that the total repair time was 23.00 hours "to find all the shorts and repair all the issues with the module programming etc." **(# 30-3 at 3)**. All repairs were covered by the warranty at no cost to Mr. Molina **(# 30-3 at 4)**, and on March 2, 2018, the Phil Long dealership notified Mr. Molina that the vehicle was ready for pick up. **(# 30 at 6, # 36 at 5)**.

**Second Repair**

Five days later, on March 7, 2018, the vehicle was returned to the Phil Long dealership with the following complaints of the same and additional defects: (1) the blind spot and cross traffic fault message comes on the information panel intermittently; (2) the running boards stop working; (3) the lights in the center console flicker on and off; (4) no control to the radio and heater functions; and (5) no control to the front two windows. **(# 30-4 at 1)**.

The repair records indicate that the technician road tested the vehicle and verified that the running boards and the window controls were not working properly. Along with making other repairs, the technician noted that the battery "will not hold charge," and replaced it. **(# 30-4 at 2-3)**. Following the repairs, the technician noted "no fail messages and running boards and window working normal at this time." **(# 30-4 at 3)**. On April 19, 2018, Mr. Molina sent Ford Motor Company a letter requesting a "buyback" of the vehicle stating that the vehicle is "still [at the dealership] without remedy to the same issues." **(# 30-5)**. This round of repairs was purportedly completed by April 27, 2018 when Mr. Molina's son retrieved the vehicle. **(# 36-1 at 74)**.

At his deposition, Mr. Molina testified that after the second round of repairs, the vehicle continued to malfunction in that (1) the lights would flicker on and off and (2) the blind spot and cross traffic system would frequently repeat fault messages every time the vehicle was driven. **(# 30-6 at 74-76)**. As a consequence, Mr. Molina "eventually parked the vehicle" with less than two thousand miles on the odometer and has not driven it since nor sought further repairs. **(# 30 at 6)**.

On August 29, 2018, Ford denied Mr. Molina's "buyback" request stating that the "vehicle does not appear to meet the requirements for a repurchase/replacement under the New York or Colorado state buyback criteria" and recommended that Mr. Molina "continue working with the Service Manager of Phil Long Ford of Chapel Hills to repair your vehicle." **(# 30-1)**.

**This Action**

On August 1, 2018, Mr. Molina brought this action asserting three claims against Ford: (1) breach of the MMWA pursuant to 15 U.S.C. § 2301; (2) a declaratory judgment that Ford's procedures do not comply with the provisions of the MMWA, and (3) breach of express warranty and implied warranty pursuant to the Colorado Uniform Commercial Code ("CUCC"), Colo. Rev. Stat. § 4-2-101 *et seq*. **(# 1, # 30 at 3)**.

Mr. Molina moves for partial summary judgment on one theory --- breach of express warranty. Ford moves for partial summary judgment arguing that Mr. Molina is not entitled to treble damages as a matter of law.[3]

---

[3] Apparently this is directed to an allegation statement in Claim I brought under the MMWA that Mr. Molina is entitled to treble damages pursuant to Colo. Rev. Stat. § 44-20-124(1)(a), which prohibits automobile manufacturers, distributors, or manufacturer representatives from "willfully fail[ing] to perform or cause to be performed any written warranties made with respect to any motor vehicle or parts thereof." **(# 1 at 6)**.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material

fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a prima facie case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

## DISCUSSION

### A. Mr. Molina's Motion for Partial Summary Judgment

The Court begins with Mr. Molina's motion in which he seeks summary judgment on his third claim — breach of express warranty under the CUCC. He argues that Ford failed to "timely correct manufacturing defects in factory-supplied materials or factory workmanship" on his new Ford vehicle, breaching its warranty. **(#30 at 5)**. In response, Ford contends there are

7

disputed issues of material fact as to whether and to what extent Mr. Molina's vehicle was repaired, precluding entry of summary judgment on the breach of express warranty claim.

To state a claim for breach of express warranty under the CUCC, a plaintiff must allege (1) the existence of a warranty; (2) breach of the warranty; (3) injury proximately caused by the breach; and (4) that defendant received timely notice of the breach. *Fiberglass Component Prod., Inc. v. Reichhold Chems., Inc.*, 983 F. Supp. 948, 953 (D.Colo. 1997) (citing *Palmer v. A.H. Robbins Co.*, 684 P.2d 187 (Colo. 1984)). Ford argues that genuine issues of fact exist as to elements two and three — whether it failed to comply with the terms of its written limited warranty and whether such failure caused a loss to Mr. Molina.

1. **Existence of an Express Warranty and its terms.**

The parties are in agreement that the CUCC applies to Ford's warranty obligations to Mr. Molina. Colo. Rev. Stat. § 4-2-102; *see Hersh Companies, Inc. v. Highline Village Assoc.*, 30 P.3d 221, 225 n.5 (Colo. 2001). They also agree that the New Vehicle Limited Warranty constitutes the express warranty pursuant to Colo. Rev. Stat. § 4-2-313. Thus, the scope of Ford's warranty is determined by its terms. It requires Ford (through its dealerships) to:

- Remedy defects during the warranty period;
- By repair, replacement or adjustment of defective parts ;
- Within a reasonable time and a reasonable number of attempts. **(# 30-2 at 9, 12-13)**.

The parties agree that the malfunctions of Mr. Molina's vehicle constituted defects that required repair, replacement or adjustment during the warranty period. As to whether

the defects were remedied and whether Ford had a reasonable time and number of attempts to do so, Mr. Molina bears the burden of proof.

### a. Were the Vehicle's Defects Remedied?

Mr. Molina's evidence is comprised of his deposition testimony and the repair records for the January – March repair and the March – April repair. The deposition testimony is relatively straightforward, but some parts of the repair records are difficult to understand because they contain technical references and acronyms.[4] Unfortunately, Ford has not submitted any evidence that clarifies the technical aspects of the repair records. Thus, the Court has interpreted those portions that are readily intelligible in the light most favorable to Ford, but gives no significance to technical references for which the meaning is unclear.

In January 8, 2018, when Mr. Molina took the vehicle to the dealership, there were multiple problems with the electrical system. The service repair notes state his complaints as: (1) repeated fault messages in the blind spot and cross traffic detection system; (2) running boards failing to deploy; (3) center console lights flickering; (4) no control of radio or heater; and (5) no control of the front two windows. **(# 30-3).** The repair records show verification of the defects and extensive research and testing to find their cause, including consideration of whether there was proper programming and the existence of intermittent shorts between various modules and ground wires. **(# 30-3).** Ultimately, almost two months after the vehicle was delivered for

---

[4] For example, the March – April repair record provides in part: "ROAD TEST AND RETEST SET KOEO PASS VERIFY RUNNING BOARDS STOP WORKING AND WINDOW WONT ROLL DOWN PPT E FOR U0199 E1 YES E2 E3 NO E4 NO E5 NO E6 NO CLEARED CODES AND DID NOT RESET AFTER 10 SEC PPT FOR U0200 . . ." **(# 28-3 at 7)**. This quoted portion is typical of the information contained in both repair records.

repair, the technician road tested the vehicle and reported that there "were no issues present". **(#30-3)**. The vehicle was ready to be picked up on March 2, 2018. **(# 30-3)**.

Five days later, on March 7, 2018, the vehicle was returned to the dealership with precisely the same issues. **(# 30-4)**. Again, the technician verified the defects, and engaged in diagnostic testing and found yet another problem in the battery's inability to hold a charge which affected the start/stop function. **(# 30-4)**. The repair records suggest that at some point "no fail messages" were found. **(# 30-4)**. The vehicle was made available for pick up on April 30, 2018, approximately 45 days after it was brought in the second time.

Even after the second repair, however, Mr. Molina continued to experience electrical defects. According to his deposition testimony, he continued to experience "blind spot and cross traffic fault messages" **(# 36-1 at 74:16-22)** and the lights continued to flicker on and off **(# 36-1 at 76:5-24)**.[5]

The warranty requires that all defects be remedied by "repair, replace, or adjust defective parts in the prescribed manner." **(# 30-2 at 12-13)**. To show a genuine issue of material fact as to whether all defects were repaired, Ford must either dispute Mr. Molina's testimony with contrary evidence, or affirmatively show that after the second repair all defects were remedied. It has done neither. Ford has not come forward with any evidence to rebut Mr. Molina's statements with the blind spot and cross traffic fault messages after the second repair, nor has it offered evidence such as computer "clear codes" and "no fail messages" which might indicate

---

[5]     At his deposition, Mr. Molina could not confirm whether the radio, window, or heating controls were fixed after the second repairs because he never attempted to test them to see if they were functioning properly. **(# 36-1 at 76-78)**.

that all defects were repaired. On this record, the Court finds that the vehicle's defects were not fully remedied after the second repair.

### b. Was Ford provided a reasonable time to remedy the vehicle's defects?

The warranty grants Ford a "reasonable time" and a "reasonable number of attempts within which to diagnose and repair any defect". **(# 30-2 at 12-13)**. Mr. Molina contends that the time that Ford had for the two repairs, January 8 to March 2, 2018 and March 7 to the end of April 2018, constitute a reasonable time and number of attempts to remedy the vehicle's defects. Indeed, during the first nine months Mr. Molina owned the vehicle, it was at the dealership for more than three months. **(# 30 at 6, # 36 at 5).**

After each repair, which included reprogramming the vehicle's computer and replacing multiple electrical components, Mr. Molina experienced continuing electrical problems.[6] However, Ford has not come forward with evidence to suggest that electrical problems of this type require more than 100 days or more than two visits to remedy. For example, there is no evidence that electrical problems such as these are particularly difficult to diagnose, customarily require multiple visits or that continuing problems are often experienced. Thus, on this record, the Court finds no genuine dispute that Ford had a reasonable amount of time to remedy the vehicle's defects.

---

[6] The Colorado Lemon Law, Colo. Rev. Stat. § 42-10-103(2)(a)(II), presumes that a "reasonable number of attempts have been undertaken to conform a motor vehicle to the warranty if . . . the motor vehicle is out of service by reason of repair for a cumulative total of thirty or more business days of the repairer." While the Court acknowledges this statute is not binding in this case, it is suggestive of what might be a reasonable period of time.

11

### c. Did Ford's breach proximately cause injury to Mr. Molina?

The parties appear to agree that Mr. Molina paid more than $58,000.00 **(# 28-1)** for the vehicle and that it was unusable for approximately 100 days during the first nine months that he owned it. The record establishes that the vehicle's defects continue, and it is undisputed that due to safety concerns, Mr. Molina has garaged it and not driven it since 2018 **(# 36-1 at 40:9-22, 75:6-7)**. Accordingly, Mr. Molina has demonstrated that Ford's failure to remedy the vehicle's defects has injured him.

### d. Did Ford have notice of Mr. Molina's breach of warranty claim?

The CUCC states that "[w]here a tender has been accepted … [t]he buyer must within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Colo. Rev. Stat. § 4-2-607(3)(a). This notice requirement serves three purposes: "(1) affording the seller an opportunity to correct any defect; (2) affording the seller an opportunity to prepare for negotiation and litigation; and (3) providing the seller a safeguard against stale claims." *Palmer v. A.H. Robbins Co., Inc.*, 684 P.2d 187, 206 (Colo. 1984). It is undisputed that on April 19, 2018, Mr. Molina sent Ford a letter in which he requested a "buyback" of the vehicle due to its defects. **(# 30-5)**. Ford does not contest that this letter constitutes timely notice of the breach of warranty.

Thus, the Court finds that the evidence of record is sufficient to prove Mr. Molina's claim of breach of express warranty under the CUCC. The Court further finds that Ford has failed to come forward with competent, contradictory evidence to establish a genuine factual dispute as to its breach. Accordingly, entry of judgment in favor of Mr. Molina is appropriate on this claim.

## 2. Did the Warranty's Limitation on Remedies Fail of its Essential Purpose?

Pursuant to the CUCC, where an express warranty exists, the parties may "limit[] the buyer's remedies to … repair and replacement of nonconforming goods or parts." Colo. Rev. Stat. § 4-2-719. Where "the remedy is expressly agreed to … it is the sole remedy" unless "circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title." *Id.* A limited remedy fails of its essential purpose if it deprives a party of the substantial benefit of the bargain. When a seller cannot cure defects by repeated repair attempts, a remedy limited to repair fails of its essential purpose. *See Rose v. Colorado Factory Homes*, 10 P.3d 680, 684 (Colo.App. 2000); *Leprino v. Intermountain Brick Co.*, 759 P.2d 835, 837 (Colo.App. 1988) (action or inaction of the seller can cause a limited remedy to fail of its essential purpose).

The warranty here is a limited, express warranty. It obligates Ford to remedy defects and limits Mr. Molina's remedy to "repair, replacement, or adjustment of defective parts". But it also provides: "[t]his exclusive remedy shall not be deemed to have failed its essential purpose as long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner." **(# 30-2 at 13)**.

Mr. Molina argues that the limitation of his remedies to repair, replacement, or adjustment is unenforceable because the warranty failed of its essential purpose entitling him to elect his remedy of a refund. **(# 30 at 8)**. Ford disagrees.[7]

Whether the limited warranty fails of its essential purpose, requires a two-tiered evaluation: (1) identification of the essential purpose of the limited remedy and (2) whether it

---

[7] Ford argues that there is a genuine dispute as to material fact – that the vehicle was repaired or that it could be. But, as noted above, it offers no evidence of those contentions.

13

failed to accomplish that purpose. *Cooley v. Big Horn Harvestore Systems, Inc.*, 813 P.2d 736, 744 (Colo. 1991). The stated purpose of the warranty is: "only to remedy manufacturing defects that result in vehicle part malfunction or failure during the warranty period." **(# 30-2 at 13)**. The Colorado Supreme Court has explained that when a warranty, like the one at issue, promises to repair or replace defective parts, it "supplies assurance [to a buyer] that within a reasonable period of time defective goods will be put into the condition they were warranted to be in at the time they were purchased." *Id.* Thus, in order to determine whether a limited remedy fails of its essential purpose, a plaintiff must show that (1) the product was defective; (2) the defendant had the opportunity to repair or replace the defects but was unable to do so; and (3) this affected the value of the product to plaintiff's detriment. *Scott v. Honeywell International, Inc.*, 2015 WL 151727 at *6 (D. Colo. 2015) (citing *Cooley*, 813 P.2d at 744).

As the Court discussed in the previous section, the undisputed facts establish all of the required elements – the vehicle's electrical system was defective, Ford had two extensive opportunities to remedy the defect, and despite its efforts, defects remained. As a consequence, Mr. Molina has lost use of the vehicle. Accordingly, the Court concludes that the warranty's limited remedy failed in its essential purpose, entitling Mr. Molina to all other remedies set forth in Article 2 of the CUCC.[8] *See Leprino*, 759 P.2d at 837 (under § 4-2-719(2), "where circumstances cause an exclusive or limited remedy to fail of its essential purpose, the full range of Article 2 remedies becomes available.").

---

[8] Given the Court's determination that the limitation of remedies failed of its essential purpose, the Court need not address whether the warranty was a limited warranty pursuant to the MMWA.

14

## B. Ford's Motion for Partial Summary Judgment

Ford also moves for partial summary judgment on a single issue -- Mr. Molina's entitlement to treble damages pursuant to the Automobile Dealer Statute, Colo. Rev. Stat. § 44-20-124(1)(a). Ford argues that this statute applies to warranties between a manufacturer and a motor vehicle dealer, but not to warranties to a consumer who purchases a vehicle. **(# 28)**. In response, Mr. Molina contends that the statute's plain language "dictates" that it applies to consumer warranties. **(# 34 at 6)**. Ford is correct.

"Statutory interpretation is a matter of law appropriate for resolution on summary judgment." *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011). In interpreting a statute, a court begins with the plain language of the statute; the words should be read in their context and with a view to the overall statutory scheme. *Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1234 (10th Cir. 2006) (citation omitted). If the statutory language is clear, the analysis ends and the plain meaning must be applied. *Thomas*, 631 F.3d at 1161. However, if the language is ambiguous, the court may look beyond the plain text and examine legislative intent and overall statutory construction to resolve the ambiguity. *Id.*

Title 44 Activities Regulated by the Department of Revenue, Article 20 Sale of Self-Propelled Vehicles, Part 1 Motor Vehicle Dealers, sets forth the General Assembly's legislative declaration that:

> (a) The sale and distribution of motor vehicles affects the public interest, and a significant factor of inducement in making a sale of a motor vehicle is the trust and confidence of the purchaser in the retail dealer from whom the purchase is made and the expectancy that the dealer will remain in business to provide service for the motor vehicle purchased;
>
> (b) Proper motor vehicle service is important to highway safety and the manufacturers and distributors of motor vehicles have an obligation to the public not to terminate or refuse to continue their franchise agreements with

retail dealers unless the manufacturer or distributor has first established good cause for termination or noncontinuance of the agreement, to the end that there shall be no diminution of locally available service;

(c) The licensing and supervision of motor vehicle dealers by the motor vehicle dealer board are necessary for the protection of consumers, and therefore, the sale of motor vehicles by unlicensed dealers or salespersons, or by licensed dealers or salespersons who have demonstrated unfitness, should be prevented;

(d) Consumer education concerning the rules of the motor vehicle industry, the considerations when purchasing a motor vehicle, and the role, functions, and actions of the motor vehicle dealer board are necessary for the protection of the public and for maintaining the trust and confidence of the public in the motor vehicle dealer board; …

Colo. Rev. Stat. § 44-20-101. The article applies to "each sales, service, and parts agreement," which "means an agreement between a manufacturer, distributor, or manufacturer representative and a motor vehicle or powersports dealer." §§ 44-20-101(e)-102(24).[9] Additionally, section 44-20-117 expressly refers to warranties between a dealer and a manufacturer requiring licensed manufacturers to file "with the director all written warranties and changes in written warranties that the manufacturer makes on any motor vehicle or parts thereof" and clarifies that the "warranties and obligations constitute the dealer's only responsibility for product liability as between the dealer and the manufacturer." *Id.* Thus, the statute is directed to enforcement of written warranties between and among manufacturers, distributors and manufacturer representatives.

Section 44-20-124(1)(a) states that "(1) It is unlawful and a violation of this part 1 for any manufacturer, distributor, or manufacturer representative: (a) To willfully fail to perform or

---

[9] The statute clearly distinguishes between manufacturers and distributors and consumers. It also defines a "consumer" as a "purchaser or lessee of a motor vehicle used for business, personal, family, or household purposes" as compared to a "purchaser of motor vehicles primarily for resale". § 44-20-102(6).

16

cause to be performed any written warranties made with respect to any motor vehicle or parts thereof". *Id*. As a remedy for breach of such warranties, section 44-20-131 then provides treble damages as follows:

> (2) If any person suffers any loss or damage by reason of any unlawful act as provided in section 44-20-124(1)(a), the person shall have a right of action against the manufacturer, distributor, or manufacturer representative. In any court action wherein a manufacturer, distributor, or manufacturer representative has been found liable in damages to any person <u>under this part 1</u>, the amount of damages so determined shall be trebled and shall be recoverable by the person so damaged. Any person so damaged shall also be entitled to recover reasonable attorney fees as part of his or her damages. (emphasis added) *Id*.

The Court appreciates Mr. Molina's reference to "any person" in the remedy provision of 44-20-131, but it must read the statute as a whole and interpreting it in a manner so as not to render words or phrases superfluous. *People v. Cross*, 127 P.3d 71, 73–74 (Colo. 2006). Doing so, it is clear that the General Assembly intended for § 44-20-131 to apply to disputes between automobile dealers and manufacturers rather than to general consumers. General consumers are protected by provisions of the CUCC[10] and Colo. Rev. Stat. § 42-10-103. Simply put, this remedy is limited to breaches of warranty between automobile dealers and manufacturers, not consumers.

Thus, the Court finds Colo. Rev. Stat. § 44-20-124(1)(a) is inapplicable.

## C. Damages

Given that the Court has found that Ford has breached its warranty obligations to Mr. Molina, Mr. Molina is entitled to the remedies accorded by the CUCC in Colo. Rev. Stat. § 4-2-

---

[10]   Indeed, Colo. Rev. Stat. § 4-2-714(2)-(3) specifically provides that "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.*; *see Judd Const. Co. v. Bob Post*, 516 P.2d 449, 451 (Colo.App. 1973).

714(2)-(3). There is no evidence of loss under this provision before the Court. Although Mr. Molina has requested a trial on damages, it is not clear that a trial is necessary

## **CONCLUSION**

For the foregoing reasons, the Plaintiff's Motion for Partial Summary Judgment **(# 30)** is **GRANTED** as to Ford's liability on Mr. Molina's breach of express warranty claim under Colorado law. The Defendant's Motion for Partial Summary Judgment **(# 28)** is **GRANTED** to the extent that Colo. Rev. Stat. § 44-20-124(1)(a) does not apply to determine the remedy for the breach.

As to the question of loss, the parties shall confer to determine whether there are any disputed issues of material fact. If not, within 21 days of the date of this Order, the parties shall submit a proposed judgment in favor of Mr. Molina and against Ford. If the parties cannot agree as to the amount of loss, then by such deadline they shall each file a brief and supporting evidence that

- identifies the specific categories of damages to which Mr. Molina is entitled, the legal basis, and what evidence exists to support such damages; and
- addresses whether a jury trial is necessary.

Dated this 28th day of February, 2020.

**BY THE COURT:**

*Marcia S. Krieger*
_____

Marcia S. Krieger
Senior United States District Judge